IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN HUMPHRIES and )
JANICE HUMPHRIES, )
)
Plaintiff )
)
vs. )     CASE NO. CV02-HGD-0168-NE
)
EMPLOYERS INSURANCE OF )
WAUSAU, a Mutual Company, )
)
Defendant )

**ENTERED**

JAN 2 7 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

## MEMORANDUM OPINION

This matter is before the undersigned United States Magistrate Judge

based upon the consent of the parties in accordance with 28 U.S.C. § 636(c)

and Rule 73, Fed.R.Civ.P.  A bench trial was held before the undersigned on

November 24, 2003.  Based on the record and the testimony and evidence

adduced at trial, the court makes the following findings of fact and conclusions

of law.

Plaintiffs, John and Janice Humphries, residents of Cullman County,

Alabama, allege that defendant, Employers Insurance Company of Wausau

(Wausau), breached a contract of insurance between the parties.  [Doc. #1,

Complaint].  It is undisputed that Wausau issued a policy of insurance to

plaintiffs on or about August 7, 2000, insuring plaintiffs' chicken houses against



loss by wind and other peril and to pay replacement costs. Plaintiffs allege that, on or about July 10, 2001, their chicken houses were damaged by wind and that they gave defendant timely notice of this occurrence along with a claim for benefits. They assert that Wausau has refused to pay the full amount due under the policy. [*Id.*].

The dispute between the parties centers around a disagreement regarding the extent of the damage caused by the wind during the August 7, 2000, storm.   Plaintiffs assert that certain damage is attributable to the storm; however, Wausau asserts that damage is attributable to other causes for which it has no liability under the policy, such as general wear and tear and settling. Specifically, the policy provides, in pertinent parts:

* * *

> 3.      Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss, Condition, Valuation, of this Coverage Form.

[Policy, Plaintiffs' Exh. 1, Building and Personal Property Coverage Form, at 15].

> 1.      We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other causes or events that contributes concurrently or in any sequence to the loss.
>
> * * *
>
> b.      Earth Movement
> >        (1)      Any earth movement (other than sinkhole collapse), such as earthquake, landslide, mine subsidence or earth sinking, rising or

2

shifting.   But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

\* \* \*

2.  We will not pay for loss or damage caused by or resulting from any of the following:

    \* \* \*

    d.   (1)   Wear and tear;
         (2)   Rust, corrosion, fungus, decay, deterioration, hidden or latent defect, or any quality in property that causes it to damage or destroy itself;

             \* \* \*

         (4)   Settling, cracking, shrinking, or expansion;

             \* \* \*

3.  We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c.   But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

    a.   Weather conditions.   But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. to produce the loss or damage.

    \* \* \*

    c.   Faulty, inadequate or defective:

3

(1) Planning, zoning, development, surveying, siting;
(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
(3) Materials used in repair, construction, renovation or remodeling; or
(4) Maintenance.

[*Id.*, Causes of Loss—Special Form, at 1, 3, 4-5].

After the storm, an adjuster came to plaintiffs' farm on defendant's behalf. Emergency repairs were made by FarmCo Builders, Inc. Estimates for complete repairs were obtained from FarmCo, Porter & Baker, and AgriBusiness. The AgriBusiness estimate for repairs was $35,201.25 for each chicken house. Porter & Baker estimated the cost of repair for buildings one and two to be $41,301.28 each. For building three, it estimated the cost of straightening and repair to be $13,967.25. The FarmCo estimate was for $39,717.60 for each chicken house. These estimates did not include the cost of removing and reinstalling fixtures and equipment in each chicken house. Plaintiffs requested Wausau pay in excess of $154,000 for repairs. These quotes include replacing the roofs, rafters, trusses, insulation and top-metal. Additionally, plaintiff's request included costs for straightening the third house and removal of equipment from the houses during repairs.

After the estimates were obtained, the adjuster employed an engineer, John Stewart of Rimkus Consulting Group, Inc., to examine the chicken houses. Thereafter, Wausau declined for pay for the repairs as set out in the original

4

estimates.  Instead, defendant offered to pay $8,480 for the damage it believes was caused by the windstorm, less a $5,000 deductible amount set under the policy.

The engineering company hired by Wausau, Rimkus Consulting Group, sent its engineer, John Stewart, who performed two on-site inspections.  He determined that the majority of the damages to the chicken houses was not caused by the wind but was damage caused by dry rot, moisture, impact by equipment, corrosion, settling and other long-term causes unrelated to the storm.

Plaintiffs concede that the chicken houses were older structures. However, they also contend that they were in good condition prior to the storm.

## Plaintiffs' Testimony and Witnesses

The first witness called by plaintiffs was Mr. Ken Driskill.  Driskill is the owner of an insurance agency in Arab, Alabama.  He testified that he obtained insurance policies for plaintiffs' chicken houses back in July 2000.  [Tr. at 8].[1] He determined that two of the chicken houses were built in 1978 and one was built in 1980.  [*Id.* at 8]. Before issuing the policy, Driskell inspected plaintiffs' chicken houses and found them to be in good condition for their age despite

---

[1]  References to the trial transcript are by the notation "Tr. at (page number(s))."

5

some rusting of the metal roofs on buildings one and two caused by the presence of ammonium nitrate. [Id. at 8].

According to Driskell, the chicken houses needed some minor repairs, which he believed involved installation of a certain type of circuit breaker box (subsequently installed). [Id. at 9-10]. During his inspection he noticed that there were numerous pieces of heavy equipment hanging from the ceiling, a practice he described as typical for older chicken houses. [Id. at 23]. The insurance policy for these structures was written to include a $5,000 deductible. [Id. at 10-11].

After the storm, Driskill observed that roofing on the houses was bent. He also observed that one of the structures, building three, was leaning. However, he could not say whether the leaning was the result of wind or age. He testified that the leaning was not noticeable at the time he issued the policy. [Id. at 25]. Had the building had a noticeable tilt at the time the policy was insured, Driskill states this would not have been acceptable to the insurance company. [Id. at 26].

Mr. Jake Biddle also testified. [Id. at 22]. Biddle is a feed-mill representative for Wayne Farms, LLC. Before this, he was a field representative for the same company. His job was to offer recommendations and suggestions to 22 different poultry growers. Biddle is acquainted with plaintiff, John Humphries, and visited the Humphries' farm weekly when he was a field representative. [Id. at 28-29]. While Biddle testified that the chicken houses

6

owned by the Humphries met the Wayne Farm equipment standards, he was not a "structural person" and could not say whether they were in good physical shape. [*Id.* at 30].

Jim Rayl, a resident of Cullman County, testified that he grows chickens for Tyson. [*Id.* at 33]. He testified that on July 10, 2001, while working with his wife in his chicken houses, he observed a storm come through the county with high straight-line winds. The wind caused his wife to run out of the chicken house she was in because the equipment inside shifted by about two feet. It also damaged the rafters and damaged two of his houses. [*Id.* at 33-34].

One of the plaintiffs, John Humphries, also testified in this case. He testified that he has lived on the farm in Cullman County for 12 years. According to Humphries, at the time he insured these chicken houses in August 2000, they were in good shape. [*Id.* at 40]. According to Humphries, none of the houses had any broken rafters or broken roof supports prior to the storm, the roof lines were straight, and the houses were not leaning in any way. [*Id.* at 40-41].

Humphries testified that on July 10, 2001, a storm advanced through Cullman County. The severity of the storm was such that the weather sirens were going off. [*Id.* at 42]. As the storm came across his property, Humphries testified that he observed tin flying through the air and other damage being visited upon his chicken houses. [*Id.* at 41]. According to Humphries, the

7

storm approached from the north and lasted about ten minutes. [*Id.* at 43]. The storm blew over large trees on his farm. It also damaged the roofs on the chicken houses and caused rafters inside them to break.

He called his insurance adjuster and had temporary repairs made to the structures. [*Id.* at 44-45]. The temporary repairs consisted of splicing the broken rafters and in nailing the tin roof back down so that the chickens did not get wet from further rain. [*Id.* at 46].

After the storm, Humphries noticed that one of the houses, building three, was leaning. It was not leaning before the storm hit. [*Id.* at 47]. He then had estimates made by Porter & Baker and FarmCo for the repair of the structures and to correct the lean in building number three. The persons performing the estimates advised that, in order to do the needed repairs, it would be necessary to redo all three houses "from the plate up." This means that it was necessary to remove the roof, ceiling and rafters, straighten up the side poles and replace the roof. [*Id.* at 48]. [See Plaintiffs' Exh 3, Porter & Baker estimate; Plaintiffs' Exh. 4, FarmCo estimate]. In addition, to complete the repairs, it would be necessary to remove the equipment kept inside the houses and replace it after the repairs were completed. This would include the waterers, feeders, brooders, feed lines and fans. [*Id.* at 51-52].

Various photographs taken after the storm and offered by plaintiffs depict areas of deficiencies in the chicken houses. They include photos which depict the walls of building three out of plumb (i.e., leaning). [Plaintiffs' Exhs. 8-15,

8

19-21, 23-24, 27-29]. Others depict the roofs of buildings one and two as varying in elevation. [Plaintiffs' Exhs. 16 and 17]. Still others depict damage to the tin roof purportedly caused by the windstorm. [Plaintiffs' Exhs. 22, 26, 31-33]. According to Humphries, the difference in elevation in the roofs appeared after the storm. [Tr. at 59, 62-63].

James Baker also testified at the trial. Baker testified that he is in the business of building poultry houses and does so under the name of Porter & Baker. [Tr. at 73]. In July 2001, he went to the farm owned by John Humphries to look at some chicken houses that had been damaged by a windstorm. [Id. at 74]. After reviewing the damage, Baker prepared an estimate for the repair of the property. [See Plaintiffs' Exh. 3]. It is his opinion that, in order to repair the damage done by the wind, it will be necessary to remove the roof, put up some new rafters and put the roof back on. [Tr. at 76]. The estimates for the repair of buildings one and two are identical. [Id.]. However, building three was blown sideways. According to Baker the building "had a curve in it, and it had some broken rafters in it." [Id. at 77]. This building would not cost as much to repair as the other two. He estimated the cost of repair to building three to be approximately $14,000. The cost of repair for buildings one and two would be $41,300 each. [Id.]. Baker testified that these prices would be reasonable for doing these repairs. [Id. at 78]. He further testified that the approximate cost of building a new chicken house is between $45,000 and $50,000. [Id. at 79].

9

On cross-examination, Baker conceded that he was requested to provide an estimate of the cost to completely repair any damage to the houses but was not asked to differentiate between what was wind damage and what was already there as the result of normal wear and tear and deterioration, especially with regard to buildings one and two. [*Id.* at 80-81, 82]. However, Baker also testified that, while the estimate he prepared made no attempt to differentiate between what was damage caused by the wind storm and what already existed, he could tell that one of the houses was leaning which he concluded was the result of wind damage due to the curve in the building where the wind had blown into it. [*Id.* at 81-82]. Baker denied that the lean in the building was the result of having been built that way because he believed that his company built it and because the doors would not open or close if the lean had pre-existed the storm. He also emphasized that building three had a curve in it and that "[m]ost of the time . . . when the wind hits them, it will curve them in the middle." [*Id.*].

Plaintiffs also submitted the deposition of Tim Gore for the court's consideration. Gore, operations manager and part owner of FarmCo Builders, testified that he is a builder of chicken houses. [Gore Depo. at 5-6]. According to Gore, FarmCo Builders has been in this business for 25 to 30 years. [*Id.* at 6]. He has been with the company for 18 years. [*Id.* at 16].

Gore testified that he observed plaintiffs' chicken houses shortly after the August 7, 2000, storm. Most of the damage he observed was in the roof

structure of the houses. [*Id.* at 11]. The first thing he noticed when he pulled up to plaintiffs' property was "a whole lot of metal was blown off or loose or folded up." [*Id.* at 19]. The damage he observed was consistent with wind damage. [*Id.* at 30]. However, he made no assessment of what damage he observed was storm damage as opposed to old age and wear-and-tear damage. [*Id.* at 11]. Gore made temporary repairs to the structures by tacking tin that had blown loose back onto the roofs. [*Id*. at 12].

Gore testified that he assessed the damage to the chicken houses mostly by walking around the outside, though he did look at the inside also. [*Id.* at 14]. His observations were mainly confined to looking at the roof, seeing what had to be done temporarily and what would have to be done to replace the roof. [*Id.* at 16].

Subsequently, Gore made an estimate of the repairs that needed to be performed to repair the damage that was done. [*Id.* at 22]. He considered the repairs set out in the estimate to be reasonable and necessary. [*Id.* at 22, 31]. Gore bases his conclusion that the damage done to the houses was storm damage on the fact that John Humphries told him that the storm had done the damage observed. [*Id.* at 24]. To do the repairs would require the removal of all equipment inside the houses, removing the roofing down to the top of the sidewalls and then reconstructing it. He estimates that repairs would take two weeks per house. [*Id.* at 26-28]. Gore conceded that he could not testify

11

regarding the condition of the houses before the storm. His estimates reflect what it would take to get them up to new condition. [*Id.* at 32-33].

## Defendant's Witnesses

Thomas Tierman was called as a witness for Wausau. He is employed by Liberty Mutual Property Insurance Company, the owner of the Wausau Insurance Company. [Tr. at 90]. Tierman made a field inspection of plaintiffs' property. This inspection was performed on July 18, 2001. [*Id.* at 90-91]. In the course of his inspection, Tierman observed both the outside and inside of the structures. [*Id.* at 92].

Tierman's initial observation was that the roofs on buildings one and two were corroded and rather orangish in color, except for a portion of the back side. The roof on building three was newer and had more of an aluminum color to it. [*Id.* at 92]. He could not say whether the discoloration of the tin affected its ability to keep water out. [*Id.* at 107].

On the inside he observed that there was evidence of some of the trusses and columns being cracked due to deterioration and wear and tear. There was evidence of dry rot. [*Id.* at 93]. According to Tierman, James Baker of Porter & Baker was present when he made this inspection. Because most of what he observed appeared to be long-term damage, Tierman asked Baker if he had any opinion with regard to what was pre-existing, as opposed to wind damage. Baker was not comfortable doing this. As a result, Tierman called John

12

Stewart, a structural engineer with the Rimkus Consulting Group, to render an opinion on the causation of the damage. [*Id.* at 94].

Stewart advised Tierman that there was partial wind damage to 20 percent of the roofs on the north ends of buildings one and two and a minor amount of damage (two percent) to the north end of building three. He opined that all other damage was pre-existing. [*Id.* at 96].

Tierman testified that he did not see any evidence that any of the three buildings had been hit with such a high velocity of wind that they actually moved enough to cause damage to the interior of any of the buildings. [*Id.* at 96-97]. The National Weather Service report for August 7, 2000, indicates that the daily peak winds for Cullman County for that date were 36 miles per hour with thunderstorms in the area. [*Id.* at 97].

Tierman also reviewed the coverage available to plaintiffs under their policy with Wausau. The policy covers direct physical damage due to covered causes of loss. One such covered cause is high winds. [*Id.* at 98]. There are, however, certain causes which are excluded from coverage such as wear, tear, deterioration, corrosion, settling, and cracking. [*Id.* at 98-99]. Based on the conclusions of John Stewart, Tierman prorated the cost of repairs to come up with a measure of the covered loss. According to Tierman, the roof damage was based largely on corrosion, and the truss damage was due to snapping and breaking and rotting due to settling and cracking or due to the weight of equipment hanging from the trusses. The prorated measure of damages came

13

to approximately $8,500. He offered to settle for this amount with plaintiffs. [*Id.* at 100-02].

During his inspection of the property, Tierman observed ripples in various areas of the top side of the roofs. Inside the buildings, he observed equipment that was tied directly to the rafters. According to Tierman, 80 to 90 percent of the time, the ripples on the outside of the roof correlated to areas on the inside where equipment was hung. [*Id.* at 103-04]. Tierman also identified a photograph which he testified depicts the roof system leaning and reflects a large amount of deterioration and rot in the wood that supports the tin roof of one of the buildings. [*Id.* at 105; see Defendant's Exhs. 18-E, F, G, H, and I].

On cross-examination, Tierman was proffered and read a part of the policy coverage form which reflects that it provides for replacement cost of damaged buildings, which is described therein as replacement cost "without deduction for depreciation." [Tr. at 109]. However, Tierman denied that depreciation was the same thing as deterioration and other factors. [*Id.* at 109-10]. According to Tierman, deterioration and corrosion pertain to loss and exclusions whereas depreciation applied to valuation. [*Id.*]. He testified that no covered damages would be depreciated except to the extent that Wausau would only pay actual cash value until all repairs were completed. [*Id.* at 110]. He acknowledged that depreciation is a reduction in value taken over the useful life of an object, including its condition at the time of the loss; whereas, an exclusion is a condition that exists prior to the loss itself. [*Id.* at 111].

14

According to Tierman, the policy only covers something that is unexpected and unintended and does not cover deterioration and wear and tear over time. [*Id.* at 111-12].

When questioned by the court, Tierman acknowledged that, regardless of how dry or brittle the wood had become due to aging, if it was all in one piece at the time of the storm and the winds came and caused it to break when it would not have otherwise broken had it been a new piece of wood, it would be a covered loss under the policy. [*Id.* at 114-15].

John Stewart testified that he was an employee of the Rimkus Consulting Group. [*Id.* at 115]. Stewart holds a Master of Science degree in civil engineering and an MBA in International Finance. Stewart made two visits to plaintiffs' property to determine the cause of damage that the chicken houses had suffered. [*Id.* at 116-17]. Stewart testified that he examined all three buildings, both inside and out, and reviewed a weather service report of the winds recorded in Cullman, Alabama, on the date of the storm. [*Id.* at 118]. Based on these observations, he concluded that there was some isolated damage to some of the corrugated metal panels; that is, 2400 square feet on building one, 2400 on building two, and 200 on building three. [*Id.*]. He also noticed that there was damage which he concluded was pre-existing and not attributable to the wind, including dry rot, broken wood members, sagging of roof joists and trusses and one building leaning to one side. [*Id.* at 119].

15

Stewart observed that the southern ends of buildings one and two had severely corroded metal roofing panels that were dented and sagging. [*Id.; see* Defendant's Exh. 12, Photographs 2 and 3]. Inside the barns, he noted that the sagging areas corresponded "many times" to where equipment hung from the wood roof joists inside the barn. It appeared to Stewart that, over time, the weight of the equipment had caused the roof framing to sag. [Tr. at 120-21]. A view of the interior of buildings one and two revealed equipment hanging from the roof from wooden members that appeared to be sagging more than normal. These sagging members coincided with sagging roof areas observed on the outside of the buildings. [*Id.* at 130; *see* Defendant's Exh. 12 at Photographs 16, 17, and 18]. He testified that he made the same observations with regard to a dented area of the roof ridge at the south end of building three. On the inside, equipment was hung from the area where the denting was present on the outside. [Tr. at 132; *see also* Defendant's Exh. 12 at Photographs 20 and 22]. By contrast, the north ends of buildings one and two, where the roof panels were much newer, showed considerably less sagging and denting. [*See* Defendant's Exh. 12 at Photograph 4].

According to Stewart, damage to the roof caused by the wind generally manifested itself by creases in the panels that went through the roof fasteners. This is caused by the wind lifting the panels up and bending them backwards, resulting in creases running between the fasteners on the panels. [See *id.* at Photographs 5, 6 and 7; Tr. at 122-24]. Stewart found 2400 square feet of

16

damage on building one and the same on building two. [Tr. at 124]. He observed about 200 square feet of wind-damaged roof area on building three. [*Id.* at 130].

According to Stewart, the sagging in the roof, such as that reflected in Photograph 10 of Defendant's Exhibit 12, coincided with long-term problems such as the settling of a support column on the inside. [*Id.* at 125, 127; *see also* Defendant's Exh. 12 at Photograph 11]. Another incidence of sagging was the result of the breakage of an exterior support beam which displayed significant long-term water damage and dry rot. This damage was not the result of wind. [*See* Defendant's Exh. 12 at Photograph 12]. Stewart also observed a rafter that was clearly initially installed in a twisted position, rather than upright. This was not wind damage. [See *id.* at Photograph 13].

Stewart further testified he observed no damage inside buildings one or two caused by wind. He noted that inside these buildings there is a plastic membrane attached to the underside of the roof members which contains insulation and a "long-type" of insulation on top of this. [*See, e.g.*, Defendant's Exhibit 12 at Photograph 16]. Stewart testified that, if the wind had blown off some of the corrugated metal panels, then he would have expected to see some type of damage to the plastic ceiling cover. He did not observe any such damage in buildings one and two. [Tr. at 125].

Stewart also noted that some of the roof beams were broken and had some wood rot in them. They did not appear to Stewart to be fresh breaks.

17

He testified that if a break is caused by wind damage, the wood inside the break typically appears as fresh and clear colored. The breaks that he observed were water-stained and had a darker color that matched the outside of the wood, which indicated to Stewart that the breaks had existed for a long period of time. [*Id.* at 121].

Stewart testified that he had seen wind damage that caused the cracking or breaking of roof trusses on many occasions. This type of damage occurs when the wind lifts the truss off the members, typically causing cracking or breaking in the wood on the bottom of the truss. He noted no such damage in buildings one or two [*Id.* at 126].

Stewart observed three or four posts inside buildings one and two that were broken approximately two feet above the ground. According to Stewart, this damage is not consistent with wind damage because wind hitting these buildings would not carry a force sufficient to cause a break at this height inasmuch as the wind would cause an uplift on the roof and would not cause the breakage of one particular column, breaking it sideways in the manner observed. [*See, e.g.*, Defendant's Exh. 12 at Photograph 14]. According to Stewart, this conclusion is supported by his observation that the cracks in the member exhibited in Photograph 14 of Defendant's Exhibit 12 were not fresh cracks. They were stained and discolored like the outside of the post, indicating that the cracks had been there for a long period of time. [Tr. at 129].

18

Likewise, looking at the roof beams, Stewart observed a longitudinal beam that was bowed to one side. [Defendant's Exh. 12 at Photograph 15]. According to Stewart, this is the result of incorrect installation or long-term damage but not wind damage. [Tr. at 129]. Stewart also attributed the leaning of building three to a pre-existing condition not attributable to wind damage. [*Id.* at 132]. He based this conclusion on two items. He noted that there is an in-fill at the end of the cooler walls. The cooler walls are vertical. The in-fill stretched from the cooler walls to the barn wall, which is leaning approximately ½ inch per foot. According to Stewart, the in-fill panel was cut to fit and fits tight against both the exterior wall of the cooler and the exterior wall of the barn. [*Id.* at 132-33; *see* Defendant's Exh. 12 at Photograph 21]. This indicated to Stewart that the walls were leaning in their present positions at the time the in-fill was installed. [Tr. at 134].

In addition, Stewart observed the diagonal braces in building number three and noted that there were no gaps or separations or indications of recent movement at either end of them. [*Id.* at 135]. Stewart opined that, had the building leaned or tilted to the side during the windstorm, there would be observable gaps or separations where these diagonal members abutted the support column. Therefore, he concluded that the lean in building three was not the result of wind damage. [*Id.* at 135-36].

However, Stewart testified that he recalls that the door to building three was difficult to close because of the lean in the house. He acknowledged that,

19

if the door would close before the storm and would not close thereafter, it would indicate that something had happened during the storm to cause the difficulty in closing the door. [*Id.* at 140]. He also conceded that he has no experience in building chicken houses. [*Id.* at 142].

Stewart also testified that, although he did not see any damaged rafters in building three, he does not dispute Mr. Baker's report that he observed 15 damaged rafters in this building. [*Id.*]. He did not actually climb up and look in the area where these trusses would have been visible. [*Id.* at 143]. He concluded that there were no broken trusses caused by the wind based on his observation of the plastic attached to the underside of the roof trusses. Because he observed that there was no kink or anything in the plastic to indicate that there was a broken roof member, he assumed that there were none. [*Id.*]. Stewart could not explain what would have caused broken trusses in the areas where there was no heavy equipment hanging down. [*Id.* at 143-44].

Rebuttal

After Stewart's testimony, John Humphries was recalled for further testimony. He testified that, after the storm, the doors on all the chicken houses had to be realigned and adjusted because, after the storm, they would not open or shut without the use of force. Before the storm, all doors would open and close "just right." [*Id.* at 147-48].

20

## CONCLUSIONS

Wausau asserts that plaintiffs have failed to present any evidence to support their claim for breach of contract. In particular, Wausau claims that the Humphries have failed to present any substantial evidence that their claimed damages to the three chicken houses were covered by the policy. In support of this assertion, Wausau cites *State Farm v. Shady Grove Baptist Church*, 838 So.2d 1039 (Ala. 2002). In that case, the Alabama Supreme Court held that the plaintiff had failed to present substantial evidence that the collapse of the roof of a church was covered under the policy. The policy of insurance at issue therein covered a physical collapse of any part of the building only if it was the result of certain causes. The plaintiff's only testimony of the cause of this event was the speculation of members of the church that it had been caused by blasting which was going on nearby. *See id.* at 1046.

The situation in the current case is somewhat different in that all parties agree that a windstorm caused some damage to plaintiffs' chicken houses. Thus, there is substantial evidence that the windstorm damaged plaintiffs' chicken houses. It is the scope of this damage that is at issue here. Defendant asserts that the scope of the damage caused by the storm is much more limited than that claimed by plaintiffs. Wausau claims that the evidence reflects that most of the damage to these properties was pre-existing at the time of the windstorm in August 2000. The Humphries assert that their policy with Wausau mandates repair without regard to depreciation and that the damage to their

21

buildings caused by the windstorm was substantial enough to require the straightening of building three and the replacement of the roofs on all three buildings "from the plate up" without regard to the condition of each of the buildings prior to the storm.

The two individuals who provided estimates for plaintiffs, Mr. Baker and Mr. Gore, both concluded that the entire roof on buildings one and two needed to be replaced but neither could say how much the damage to either roof was the result of wind damage as opposed to normal wear and tear or pre-existing damage. [See Tr. at 11, 80-82]. However, the civil engineer hired by Wausau testified that he could differentiate between normal wear and tear and wind damage based on the creasing he observed in the tin panels that make up the roofs in these structures. [See id. at 122-24]. Except where the panels showed this creasing, he concluded that any damage to the roof was pre-existing.

Stewart also observed the broken wooden members visible on both the inside and outside of these structures. Because they all reflected dry rot and breakage that appeared to be old, he concluded that much of the internal damage to the roof structure was pre-existing and was not caused by the storm. He also observed that some broken vertical support beams inside the structure appeared to have been damaged by having been hit by equipment or some such similar cause and concluded that they were not broken in a manner that was consistent with wind damage. Stewart also testified that sagging and

22

denting of other areas of the roof was caused by equipment hung from the support beams, beams sagging or broken due to dry rot, or by rafters installed in a non-vertical manner when the building was constructed. He estimated that approximately 20% of the roof of buildings one and two reflect damage attributable to the wind.

Plaintiffs have virtually no evidence to dispute the conclusions as to the source of the damage other than John Humphries' assertion that the rafters were not broken before the storm. The physical evidence strongly indicates that the damage to the inside areas of buildings one and two was of a long-term nature, such as dry rot and wear and tear, not wind damage. The evidence is virtually uncontradicted that the damage to the tin plates on the outside of the roof structure is limited to the areas identified by Wausau based on Stewart's investigation. Thus, the court must conclude that the damage to the tin plates is limited to the 20% for buildings one and two as asserted by defendant. The estimate for the repair of buildings one and two by Wausau of $7,992 is reasonable.

Evidence as to a correlation between the storm and the inside damage of buildings one and two is also lacking. There is no evidence which reflects any correlation between the wind damaged areas identified by Wausau and the damaged wooden support members on the inside of the structures; there was no evidence introduced which reflected damaged joists, supports, or roof beams which directly coincided with the 20% areas of buildings one or two where

23

outside wind damage occurred. There is, to the contrary, substantial evidence to support Wausau's contention that the inside damage occurred prior to the windstorm.

There is, however, more substantial evidence to reflect that the leaning of building three was the direct result of the windstorm. Although Stewart's examination recited two factors that militate against such a finding, the stronger evidence favors the conclusion that the lean was the result of the wind.

The lean is noticeable. According to Ken Driskill, insurance would not have been written on the building with such a noticeable defect, yet this policy was issued less than one year prior to the storm. All parties concede that the doors to this building were out of alignment after the storm and required force to open and shut. Mr. Baker testified that building three had a noticeable "curve" in it and that, in his experience, this is consistent with wind damage. Likewise, the broken rafters are consistent with damage resulting from the building leaning in the wind and inconsistent with the lean being the result of shoddy construction. Therefore, the undersigned magistrate judge concludes that the damage to building three is windstorm damage covered by the policy of insurance. The estimate of Porter & Baker for repairs to building three proffered by plaintiffs, $13,967.25, is reasonable.

Based on a consideration of the evidence presented in this case, the court finds that defendant, Employers Insurance of Wausau, breached its contract of

24

insurance with plaintiffs by failing to pay policy benefits for all covered and non-excluded damages to plaintiff's chicken houses.  The court further finds that plaintiffs are entitled to recover from defendant total compensatory damages in the amount of $21,959.25.

A separate order in conformity with the Memorandum Opinion will be entered contemporaneously herewith.

DONE this _____ day of January, 2004.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE